May it please the court, Edward Himmelfarb with the Department of Justice. This is a medical malpractice case under the Federal Tort Claims Act involving kidney disease in which the district court awarded about 30 million dollars to Mr. Clanton. The government doesn't dispute negligence here, but the district court made four separate legal errors, each of which independently requires a remand. First, the court failed to assess comparative negligence under objective reasonable person standard. Second, it refused to apply the state's periodic payment statutes because it disagreed with the legislature's policy decision to mandate a 6% discount rate. Third, it pulled a record-setting number out of the air for non-economic damages, and later, when forced to justify that number after the fact, it committed errors of methodology. And finally, it improperly concluded that the government is not entitled to a partial offset for payments from Mr. Clanton's hemodialysis, which come out of general tax revenues just like the judgment itself. Now, I can go through the order, but the court has questions about specific ones. I think Judge Rovner is asking a question. Oh, I'm sorry, I can't hear that. You cannot hear? I can hear a little bit. Is it possible to turn the speakers higher? I'll start. Oh, okay, they're working on it. I'm sorry, Your Honor. No, I'm sorry. You fault Judge Rosenstengel for applying what you characterized as a subjective analysis in deciding whether Mr. Clanton was contributory negligent. But in discussing what Mr. Clanton did or did not know or understand about his condition, wasn't she really focusing on what a patient in his condition might not have understood, given Nurse Jordan's negligent omission to educate him? No, Your Honor, I don't think that's what's going on because the judge did not make any fact findings about what a reasonable person would do in Mr. Clanton's situation. If this were a jury trial, there would be jury instructions that instructed the jury specifically to deal with what a reasonable person would do in these circumstances. The judge did nothing of the sort in her decision. It was a 50-page-plus opinion. She did not deal with what a reasonable person would have done. Counsel, I want to direct your attention to the repeal of this. Oh, yes. Yes. Just so that we have it out there and so that opposing counsel knows as well, we would like supplemental briefing on whether or not Illinois Public Act 101-404's repeal of Section 1705 is retroactive. Okay. So we'll issue a written order after argument today. I'd be happy to talk about it now. Well, you can talk about it a little bit if you want. I mean, I think it's a complicated enough issue and late-breaking, so we'd like briefing on it. We were thinking 14 days, no more than 15 pages. Okay, I'd be happy to, Your Honor, but let me just say one thing about that. If you look at the Perry decision that we cited in our reply brief, that's a Supreme Court of Illinois decision from last year. It's a very recent case. It sets out the entire way Illinois courts deal with retroactivity of statutory amendments. And the basic rule in Illinois is substantive amendments are perspective only. Procedural amendments may be applied to pending cases. This is obviously a substantive amendment. It repeals the statute entirely. So on that basis, I think it's pretty clear the Illinois courts would treat this as perspective only. But you could repeal a procedural statute entirely, right? Why is the complete repeal evidence that it's substantive rather than procedural? Why is it substantive? Because it changes the party's rights, Your Honor. If it applies to our case, we no longer are able to satisfy the judgment by providing security in the amount of the equivalent lump sum value of the judgment. We would have to do it based on a different discount factor. That makes a huge difference in the judgment. That's why Mr. Clanton's lawyers are complaining about it here. It makes a big difference. And also, there's language in Perry that talks about what the legislature should do if it wants to make something apply to pending cases. On page 1032 of the Perry decision, it talks about how the legislature knows how to make a statute apply to pending cases. And on the following page, on 1033, it says, if you'll give me just a second here, it quotes a case called Lazenby and says, Section 9F states that this section applies to all causes of action that have accrued, will accrue, or are currently pending before a court of competent jurisdiction, including courts of review, which is entirely different from what this statute said, which is sort of the conventional effective date provision in an Illinois statute, which is this act takes effect upon enactment, upon becoming law. That's a totally different language. There's no indication. The courts of Illinois are clear that this doesn't indicate an intent to apply to pending cases. That's a synopsis of what we're going to tell you in response to your order, Your Honor, but I thought the court ought to know that. My position is on that. Okay. Thank you, counsel. And the minimum also, we cited the case in a reply brief called Weil. What this court did, when there was even an arguable possibility that the statute would apply to, would not apply, I think in that case it would not apply to the pending case, this court remanded to have briefing and just report. Now, of course, the court wants briefing. We're happy to supply briefing, Your Honor. Well, we would, and I think there, I mean, I understand the point about the substantive versus procedural. I think there's a non-frivolous argument that it's procedural, however, and that makes it look a little bit different. Okay. We're happy to do that, Your Honor. Okay. Thank you. And I guess I could get back to the comparative negligence argument. Yes, because I think that the government has failed to come to grips with the ways in which Nurse Jordan was negligent. The government didn't challenge the district court's findings as to her negligence. And, you know, in the abstract, it may be imprudent for a patient to behave as he did, but in order to say that someone has been negligent, that someone has to have an idea of what is at stake if they miss an appointment or fail to take a prescribed medication. Well, Your Honor, you know, that might be what the judge was thinking, but she didn't say so. There are no fact findings about what a reasonable person would do in his circumstances. In fact, if you think about what a reasonable person who didn't understand what the nurse in this case, not the doctor, the nurse who was telling him, a reasonable person is going to say, what do you mean? What does that mean? What do I need to do? Is it dangerous? That's the point. The nurse wasn't telling him. That's the whole point. She told him what the problem was. She didn't tell him enough so that he could go and, you know, that he could go further on it, but he could easily have asked questions. A reasonable person would have asked questions, and a reasonable person who didn't know and didn't ask the questions would go home and ask somebody else about it. We have, you know, we have access to the Internet, and people can look up what hypertension is.  I beg your pardon? Judge, I assume that you made these points below to the district judge? We argued that it's a reasonable person standard, and we cited cases in our brief, also our opening brief, Illinois cases, that say it's a reasonable person standard for contributory negligence. No, I understand that you cited the cases in the brief before us. I'm just saying that when you were before the district court, you were making these points about the reasonable person standard and arguing that it was unreasonable for him not to have taken … The trial counsel started to make a motion, and the judge cut her off and was unable to do that, but that's the whole point of the argument. You made a choice to argue before us that this is really a question of the judge following not an objective, but a subjective standard. Correct. You did not choose to argue before us that there simply is evidence in the record of contributory negligence, and that there is evidence in the record of contributory negligence, and that the judge overlooked it, disregarded it, should have taken it into consideration, and what I'm concerned about is whether you've forfeited or waived that argument, because it seems to me there is evidence in this record of contributory negligence, and it's subjective evidence of it, but have you really preserved that argument? Well, I think we did, Your Honor, because we didn't have to introduce our own evidence of it. We could take the evidence that was before the trial court … But have you argued it here in your brief to us, or have you decided to waive that issue? I beg your pardon? Or have you decided to waive that issue? No, we're not waiving it. Well, you didn't argue that issue to us, did you? Where did you argue that issue? We didn't argue it on reconsideration by that trial. In the appellate brief here, the brief you cite, did you argue that there was evidence in the record, objective evidence in the record, the judge could have looked at of contributory negligence or should have taken into consideration? Where did you argue that in your brief here? Okay. The first several pages of the court's opinion talk about Mr. Clanton's history of appointments with Nurse Jordan. It goes through one by one. I think there were 11 total. And, for example, the judge at one of the earlier pages, I think it was six, but I can't remember the exact page, says Nurse Jordan asked him to return in a week. He didn't return in a week. The next appointment was two years and a month later. So we're taking fact findings like that, and we're saying that that shows contributory negligence. So we didn't waive anything, Your Honor, in our view. I mean, I could go on, but that's basically the outline of it. I see your view. I'm not sure what the other side has to say. All I can say is that's our position. So that's basically our position on contributory negligence. I probably should not focus so much on the periodic payment statute unless the court has questions because if the court's going to order us to do supplemental briefing on retroactivity, I guess maybe we should wait and let the court decide whether it even has to consider it. The third issue is about the large non-economic damage award. What the district court did is first it took the number, made up a number, without any justification whatsoever. That's in its decision following trial. When we moved to reconsider it, pointing out that this court has held that the district court is required to do a comparison of similar cases, the court went back and did a comparison of what it thought were similar cases, but it flatly refused to consider any case in which there was a partial damages cap, no matter how relevant the rest of the case was. Can I ask you about that standard of review when we consider this argument? Do you think that that would be abuse of discretion or clear error? But why would it be? So de novo, the methodology, I can see that that's a question of de novo, but choosing which cases are in, which cases are out, which cases are sufficiently similar, why would that be de novo? Why would that be de novo? Because the court wasn't just saying this case is out, this case is in. It says as an absolute matter, I will consider the judge said, I will consider no case in which there is a partial damages cap. And the reason the judge gave is that those cases are not particularly helpful. And the problem with that attitude is that this court has directed the district court to follow similar cases. They don't have to be identical. In fact, the district court mentioned that and the judge mentioned that in their opinion that we're talking about similar cases. They don't have to be identical. And by ruling out completely that whole class, subclass of cases, that's a methodology argument because the methodology is similar cases. It's not cases that are similar except for ones that have partial damages cap. And one thing I'd like to add about the two cases we focused on, Campano and Maumea, is that for a district judge who has an FTCA case to make a comparison, it's really important to focus on FTCA litigation. And the reason is that if there's a jury verdict, it's very hard to figure out what the jury was thinking. It's possible perhaps, but it's very difficult. Whereas with an FTCA case, there's a judge who tries the case, writes usually a long opinion, explaining all the facts and the background and the rationale for the damage award. And those cases, as a general matter, are going to be much more useful in doing a comparative case analysis. You know, I think caps make it difficult to do a reliable comparison, especially to the extent that each component of a damages award necessarily informs and affects the other components. And, you know, otherwise, Judge Rosenstengel certainly engaged in a thorough and conscientious comparative analysis. But I take your point. Yeah, let me say one thing about her analysis. Sure, she spent about 30 pages on it, but she started with a number she just made up. I mean, to be fair, she just made it up. And on reconsideration, when she went through the analysis, she said, this is admittedly higher than any other comparable case. The highest comparable case she went through, even after adjusting for inflation, was $10.4 million. She awarded $13.75 million. And even with these other cases, I admit that it's not always possible to figure out what a partially capped award would be without the partial cap. But the difference between those awards and the district court's awards here, in the neighborhood of $12 million, is a huge difference. And I think at a minimum, what the judge looking at those cases would decide is, maybe my award is really too high. Now, those cases aren't going to tell the judge, oh, you should reduce your award to exactly what we have because it's partially capped. I'm not making that argument. What I'm saying is that the court should say, oh, you know, I really went overboard on this, and I'm going to try to figure out what a reasonable award would be. And that's something she didn't do. She just said, oh, I'm going to keep the same award. It's a record-setting award. I'm going to keep the same award. And even if the court decides that the standard is abusive discretion, I would say that's an abusive discretion. The argument is de novo, but if the court disagrees, that's an abusive discretion in itself. Do you want to save your four minutes for rebuttal? I would like to save it if it's okay with the court. Thank you very much. Thank you, Mr. Himmelfarb. Mr. Talkin. May it please the court, counsel. Good morning. My name is Steve Talkin. I'm here to represent Mr. Kevin Clanton. And, your honors, if I can, I'd like to jump in on a point that Mr. Himmelfarb addressed that I think he's misstated what happened. Mr. Himmelfarb just told this court that the district court, in this case, made up her damage award, and that is nowhere near true. The court issued an initial order, memorandum in order, in March of 2017 that set forth her damage award findings, and the same numbers that are at issue now before this court. She didn't pull them out of thin air. She, in her opinion, which was approximately 50 pages, the initial opinion, explained the reason for each award of damage, in her opinion, as required by Rule 52A. Now, that's before she did the actual comparison and recited to the court or to, in her order, the 52A comparison to similar cases. But to suggest that this district court plucked numbers out of air or just simply made them up with no rational basis or tied to the evidence is untrue. Do you think a damage award like that should have begun with the comparison or begun with what the district judge did here, which is set out the reasoning in this opinion and then do the comparison? Yes, absolutely. I believe the way the district court do it is the required way. The court under Rule 52A is not supposed to base or determine the amount of damage that's warranted in a given case based upon what's happened in other cases that she may consider similar. The court has to make her ruling on an award of damages based on the facts in the case. So you have to start with your own damage assessment and award, then under Rule 52A, which is what Judge Rosenstein did, you look to the other cases that you consider similar and that you consider suitable for comparison. Part of case selection here, and it was discussed a little bit during the first part of the argument, case selection is not a methodology. It's a judgment call that the court makes. The court has to determine whether to include and exclude a given case. And part of the judgment and part of whether to include a case depends upon whether that case has the relevant data points, the information that is going to be helpful to the court to perform the comparison under the chosen methodology. So in this case, we know the district court did not use these two damage cap cases from Hawaii, and it's not an abuse of discretion. She gave a logical, plausible, reasonable explanation as to why she excluded those cases. They were on the list of 20 to begin with. She excluded them because she said specifically they aren't helpful or useful to the comparison method she chose, and therefore she excluded them. If the Hawaii cases would have entered an award of $5 million for physical or for pain and suffering, but then said we're reducing that to a statutory cap of $375,000, then potentially that case becomes useful or helpful. That would give the court the information she needs to understand what the fact finder believed was required to make the point of whole. It's similar to the case DiBiasio, which is a Seventh Circuit case. Their awards in other cases were able to be used, even though they were reduced for comparative fault because we knew what the fact finder awarded originally for the full award before the comparative fault reduction. What about Mr. Himelfar's argument that she made it part of the methodology by saying that as a matter of law... Fair enough. Thank you. Caps are out. That is one of the things I also wrote down that I wanted to respond to. Our trial court did not establish and follow some per se rule that she can't consider damage cap cases. Despite what the government says, that is not what she did. If we look at the record, she is the one that actually added the Campano case to the list of 20. The parties didn't submit that Campano Hawaii case. The defense or the government submitted the first case, but not the second case, Campano. And the court never said because it's damage cap, I am not going to consider it as a matter of law. She simply said because I don't have the data necessary that she finds important because she doesn't know what it would take to make the plaintiff whole. That is why she found these three specific cases not helpful. It is not a rule that she inserted or announced and followed, as the government would suggest. Counsel, let me ask you a question about the motion you made in the district court to have her add in the standard that she applied in considering the comparative negligence. Is that a concession that she then didn't acknowledge and apply the right standard? Absolutely not, Your Honor. Then why did you seek it? Because in preparing for this argument, I've reread Rule 10. Rule 10E1 suggests, or actually in my opinion requires, that if there's a difference in opinion as to what happened at the district court, if there's a difference of opinion, then you go to the district court to ask them to clarify or modify. We believe, as we've briefed, that the record clearly shows she used the reasonable person standard. There's three parts of the record where she talks about references to reasonable standard, says Mr. Clanton acted reasonably and expected to be called about labs, and she is describing what it takes for a reasonable person, a generic individual or patient, to be considered contributory negligent, and therefore she's referencing the reasonable person standard when considering Mr. Clanton's conduct. But so we believe the record is clear. That is not the relief we were asking for from the district court. We basically took the position plaintiffs believe clearly the record shows she used the right standard. There is a difference in opinion as to what standard was employed between the government and the plaintiff, and just for that reason ask the court simply to state what standard did you apply. We thought it would... In terms of Mr. Clanton's own conduct and whether it was negligent, might his failure to keep a follow-up appointment or take a prescribed medication constitute contributory negligence regardless of whether he was adequately counseled on the nature of his condition and the attendant risks? Thank you, Your Honor. No, respectfully, no. That wouldn't constitute him being contributory negligent under Illinois law because he still has to be shown to be the proximate cause of his harm. And if he doesn't understand and if the reasonably objective reasonable person wouldn't understand the link between ongoing hypertension and kidney damage, then he can't be found to be the proximate cause of his injury, and therefore he would not be considered contributory negligent under Illinois law even if he didn't show up for an appointment or take some of his medicines. And that leads me to another point. Part of what the court needs to do, the court does have to consider certainly what the reasonable person would know or should know about a condition and its risks and the need for treatment. The court, as part of the reasonable person standard, also has to look at Mr. Clanton's actual knowledge because if the court determines the reasonable person would not know or should not know, but because of something in Mr. Clanton's specific background or education, he does know that he could develop kidney damage because of ongoing hypertension, that information certainly becomes relevant to an analysis for the court as to whether Mr. Clanton was negligent. So when the government suggests that she's unduly focusing on subjective knowledge or actual knowledge of Mr. Clanton, part of that discussion is necessary and it is part and parcel of the reasonable person standard analysis. I have a question. Well, okay. Do we know anything about the amount that Medicare can eventually recover from Mr. Clanton via the reimbursement process that you referenced in your brief versus the offset the government is seeking here? In other words, would the amounts be the same? Would they be less? Would they be more? So I think there's certainly a difference. Are you ready, Your Honor? I'm sorry. I cut you off. Oh, surely. Okay. So if I have your question, I think the government, and we've set this forth in our briefs both at the trial court level as well as this level, the government is truly overreaching on their claim for a set-off. If, you know, we certainly take the position that Medicare Part B benefits are not or they are collateral benefits or collateral payments. They are not something that would entitle the government to an offset. So if you assume, though, that we're wrong, assume they got the offset, the only thing the government should get offset for is what it paid, not some corresponding percentage to the amount of the bills that Medicare would have paid for or may pay for in the future. So the government claims in the future they should get 54% of the future hemodialysis damages as credit against the judgment amount. And so this court already has dealt with future benefits being speculative in the Molsoff case, and so there's other reasons why they'd never get a set-off for future benefits that haven't been paid yet. But I know I'm going a little far afield, Judge. If the answer to the question, the shorter answer is simply there is certainly a difference between what Medicare would be reimbursed under the Medicare Reimbursement Act versus what the government is claiming they should get an offset for. Does that help answer? Well. On the order of billions of dollars. Yeah. Okay. Thank you. Thank you. So there's another point that I would like to address, and I believe, Judge Ripple, you brought up the question whether or not on the first point on appeal that she used the wrong standard. Are they really complaining that she abused her discretion in finding that Mr. Clinton was not negligent, and have they maybe waived that argument because they haven't pled that complaint on this point of appeal? And my answer is absolutely they have waived that. This is the time for appeal. They've put their eggs in the basket that she used the wrong standard. What they should have done is if they had any concerns that she abused her discretion in failing to find Mr. Clinton negligent is that they should have claimed she abused her discretion. The government's point on appeal directly from their brief for point one is that the district court erred in failing to apply the objective reasonable person standard for comparative negligence under Illinois law. They didn't say also or alternatively that she made the wrong discretionary call or abused her discretion in finding Mr. Clinton wasn't negligent. And I will say she didn't abuse her discretion, and as Judge Rovner has picked up on, the court is focusing on proximate cause. Mr. Clinton, unless the reasonable person knew or should have known about the risk of harm from his actions or Mr. Clinton actually because he had specific knowledge about the risk of harm of his actions, if you don't have that, you can't have contributory negligence because you can't have proximate cause. And therefore, the government has clearly waived any claim that she abused her discretion in finding him contributory negligent under the reasonable person standard. They should not get a second bite of it to now claim she abused her discretion. If they wanted to make that claim, they had the opportunity. They failed to do so. So another point I wanted to make, and I think we talked about a little bit, is the – well, I'd like to address the periodic payment statute for a moment, and we certainly will provide supplemental briefings on whether I guess the repeal is retroactive or just going forward. We're happy to do that. We certainly have an opinion as well. I'm not prepared to offer all of the support for our opinion at this point, but we believe it's procedural and should be therefore repealed retroactively so it wouldn't apply anyway. But I want to focus or bring to the court's attention, which I'm sure it is on your attention, the point on appeal here is very, very limited. They didn't – their point on appeal is only that the court didn't have authority under the express statutory language of 1705D to do as she did, to decline to apply the provisions. They did not challenge in their briefing or their point of appeal whether or not the court's determination that applying the provisions would not serve the purposes of the provision. They didn't challenge her exercise of the authority. They challenged only whether she had the authority. And 1705D is certainly set forth in the briefing, but I think it's important to point – I guess part of my point would be if the court agrees the clear and plain language of the statute gives the court authority to do as she did, whether this statute is retroactively effective on appeal becomes moot. But if their interpretation is right, and I think their interpretation has a lot of force, then the retroactivity of the statute matters a lot. Okay. And I will point out the only reason – so fair enough, if the court finds that the language of 1705D is not clear, that all actions really doesn't mean all actions, that all actions, as the government suggests, only means multi-claim actions but not all actions, then I agree. You can then – if there's ambiguous language, the next step would be to look to extrinsic aid. Our position certainly is it's clear. Therefore, you don't go to extrinsic aid. You read the statute for what it says, which we believe the court did. It doesn't make a lot of sense to say that the election is mandatory and then to say unless the court decides in any case can essentially nullify the mandatory requirement by saying it doesn't serve the purposes of the statute in this case. It does make more sense to think of it as if the election is made in a case as to one claim and there are others where it wouldn't qualify that the court then could make a decision. It doesn't make a lot of sense to think about it, I don't think, the way that you're proposing to. Well, fair enough, but if I could just respond. Think of what their interpretation means and the results that it has under the statute itself. If the government's right, this provision only applies to multi-claim actions, that would mean this provision does not apply to Mr. Clanton's case. So there is no mandate, no requirement to even apply these periodic provisions because 1705D, which is the section that says you must apply if elected, wouldn't apply to Mr. Clanton's case. That to me is an absurd reading. No offense, I certainly don't mean any offense to someone who disagrees with me, but that is absurd to think that. The other thing it means is that if their interpretation is right, the Illinois legislature then is only concerned with meeting the purposes of these provisions in multi-claim cases, but not in single-claim cases such as Mr. Clanton's case. That's why to us the practical effect of if all actions only means multi-claim actions would be absurd under the exact language of the statute that we're looking at. It would also render the term all actions meaningless or superfluous, which is not allowed. It's a cardinal violation of how you interpret and construct statutes. That's why I say the plain and clear reading of this, and if we didn't have a comment, and the only thing we have is a comment to the model act, this is not a comment to the Illinois statutes themselves. This is a comment to a different act, which has absolutely some different language in it. So to rely on something that doesn't even necessarily apply to the specific provisions to try and create an ambiguity that we respectfully believe doesn't exist is improper under Illinois law. I don't think that the strength of their interpretation turns on the comment. Okay. Well, thank you. If I could then, I have a few minutes left. Could you talk about the partial offset and this Laird case from Illinois? Certainly. So I think all the parties agree that if Medicare Part B benefits are collateral to the government, then under Illinois' collateral source rule, there is no offset. So the question is we basically have to determine whether these are collateral payments under Illinois law. And Illinois law per Laird, as described in Laird, is simple. It says you look to the nature and purpose of the payment and the fund, not merely the source, to determine if it's collateral. This court in Mosoff adopted the same language when it was considering Wisconsin law concerning collateral source, same rationale. You look to the purpose of the payment, not the source of the payment, to determine if it's collateral. And what that means then is that if Part B payments are made to indemnify the government from its tort liability to Mr. Clanton, then they get an offset for them. However, if Part B payments are made for some reason independent of the government's tort liability, then they do not get an offset. They're considered collateral. And here, as the court has specifically found in her order at Appendix page 97, the court said Mr. Clanton is entitled to these Part B benefits because he enrolled in the program and because Mr. Clanton paid premiums, money, for these benefits. These are insurance benefits. I understand that. I should have been a little more precise about my question. I'm sorry. No, no, no. It was my fault. Does Illinois, so the government is claiming a partial offset here. Yes. And I'm wondering whether you read Laird to maybe say that under Illinois law, there's no such thing as a partial offset. It's either collateral or it's not. Absolutely. It does not. So the facts in Laird was the parties knew within pennies of how much the railroad had contributed to the fund. The railroad paid two-thirds of the fund. These were disability pension benefits. So in Laird, the court knew what percentage was traceable to the, in this case, it would be the government, but to the defendant. And that doesn't matter. It doesn't matter. As this court noted, this court noted in Molzoff, even if 100% of it comes from the defendant, that doesn't make this a non-collateral source. You have to look at why they're paying it. And other circuits that have dealt with this exact issue, whether Medicare benefits are considered collateral source benefits to the government, in an FTCA case such as this, have all said they are collateral. They're collateral where the claimant has contributed to the funding. And that is 100% what we have here. Medicare Part B payments were made to Mr. Clinton regardless of this lawsuit. If he never had this lawsuit, he was getting those payments only because he paid premiums and they are akin to insurance. The government, in their reply brief, suggests these Medicare Part B payments are pure gratuities. That is 100% wrong. If Mr. Clinton didn't pay for these benefits, he would have not gotten them. He did not get them automatically. Thank you. Thank you. Mr. Himelfarb, rebuttal. I just have a couple of quick points, and then I can answer anything the court is interested in. The first quick point is that if you look at Model Act Section 3A, the language is essentially verbatim in Section 2-1705D. They're basically identical. I mean, minor changes, section versus act, and that kind of thing. They're basically identical. The legislature obviously took it from the Model Act. That's all I want to say about that subject unless there are questions. I want to say something about the case law on partial offset. The cases recognize the possibility that the government can show the portion of a benefits program that is funded by general tax revenue. It has never been able to do that, and this is the first case ever in which the government has tried to prove the portion of the benefits that come from general tax revenues. And we had an economist provide evidence below. The court excluded it, but it's the 54%. Basically, close to three-quarters of these benefits come from general tax revenues, and the reason is simple. Congress created this special ESRD, end-stage renal disease program, as part of Medicare. You don't have to be eligible for Medicare to participate in it. Congress wanted to fund benefits for people with a specific disease, and it gave, I think, figure 73% of the money that goes to this program comes from general tax revenues. So it's heavily funded by the government from general tax revenues. The same way the judgment is going to be paid out of general tax revenues, and this is, too. We're not claiming the other 46%. We recognize the other 46% as a collateral source. It's not going to be offset, but the 54% should be offset, or at the minimum, the court on remand should hold a hearing and let the plaintiff come in and produce evidence, and we're willing to have a dispute over the evidence of what the percentages are. But the general principle is that there should be a partial offset. You don't necessarily look to state law cases on this, because in a state law case, the way it's going to work is that Medicare benefits are never paid by the defendant. The defendant in a state law case is not going to be the federal government. So those cases are not going to be directly relevant. But the case law we cited in our brief, in our reply brief on this issue, shows that the courts recognize the theoretical possibility that the government can prove what that figure is. The government is entitled to a partial offset, and we should be allowed to produce that evidence in district court, although the court excluded it. One minor thing I wanted to add before I finish is that Mr. Telkin said that the district court added the Campano case on its own. The reason is the Campano case was decided after the parties had submitted their list of comparable cases, so that's why it didn't come from us. We tried the case. The government tried the case in Hawaii. My office handled the preliminary aspects of the appeal, and it was eventually settled. But that case came down after the parties had supplied their comparable cases, and that's why district court came up with it on its own. And I'd be happy to try to answer any other questions that the court has about the case. Not from me. Thank you very much. Thank you. And we would ask the court to remand on each of these issues and give the district court very specific instructions just so that we don't have to come back here. Thank you very much. Thank you, counsel. The case is taken under advisement.